**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CALL ONE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21-cv-00466 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| BERKLEY INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In 2019, Plaintiff Call One Inc. ("Call One"), a telecommunications business, received a subpoena *duces tecum* ("OAG Subpoena") served by the Office of the Illinois Attorney General ("OAG") and issued pursuant to the Illinois False Claims Act ("IFCA"), 740 ILCS 175/1 *et seq*. Call One had purchased a Directors, Officers, and Corporate liability insurance policy ("Berkley Policy") from Defendant Berkley Insurance Company ("Berkley"). When faced with the OAG Subpoena, Call One tendered a claim to Berkley seeking defense costs in connection both with the OAG Subpoena and the potential underlying IFCA action. After initially denying any defense, Berkley agreed to cover the costs incurred by Call One in responding to the OAG Subpoena. Berkley, however, denied any coverage related to the underlying IFCA claims. On its own, faced with mounting defense costs and significant financial exposure, Call One entered into a settlement agreement with the State of Illinois. Contending that Berkley had both a duty to defend and indemnify the IFCA claims, Call One has filed the present action for breach of contract (Count I) and bad faith denial of coverage (Count II). Berkley now seeks dismissal the complaint in its entirety. (Dkt. No. 12.) For the reasons discussed below, its motion is denied.

## BACKGROUND

For purposes of the motion to dismiss, the Court accepts all well-pleaded facts in the complaint as true and views those facts in the light most favorable to Call One, the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The complaint alleges as follows.

### I.      Underlying Litigation

Call One sells and provides telecommunications services to customers. (Compl. ¶ 8, Dkt. No. 1.) Call One purchased a policy of liability insurance from Berkley for the policy period of June 30, 2018 through June 30, 2019, with a coverage limit of $2,000,000.00. (*Id.* ¶ 1.) On March 14, 2019, the OAG served a subpoena on Call One pursuant to the IFCA.  (*Id.* ¶¶ 26–27.) Among other documents, the OAG Subpoena sought business records related to Call One's collection and payment of Illinois taxes and fees. (*Id.* ¶ 29.) The OAG Subpoena was the first notice Call One received that it was potentially the target of an IFCA action. (*Id.* ¶ 28.)

Call One promptly tendered the OAG Subpoena to Berkley. (*Id.* ¶ 33.) Through that tender, Call One sought coverage for its response to the OAG's investigation and a defense against the underlying IFCA claims. (*Id.*) Berkley initially denied this request, contending that the OAG Subpoena was not a "claim" within the meaning of the Berkley Policy. (*Id.* ¶¶ 34–35.) After Call One pushed back on this determination, Berkley agreed to cover the costs of defense arising from the OAG Subpoena. (*Id.* ¶ 38.) Yet Berkley also made clear that its obligation would cease upon compliance with the OAG Subpoena—that is, its obligation to defend did not cover any other litigation or investigation into Call One. (*Id.* ¶¶ 39, 41.) In response to that coverage position, Call One demanded independent counsel; Berkley denied the request and asserted its right to appoint its own counsel ("Subpoena Counsel") and to control the defense. (*Id.* ¶¶ 43–45.)

Berkley limited Subpoena Counsel's appointment solely to responding to the OAG Subpoena. (*Id.* ¶ 46.)

Over several months in 2019, Subpoena Counsel worked to respond to the OAG Subpoena. (*Id.* ¶¶ 48–49.) In August 2019, Subpoena Counsel prepared a report analyzing Call One's potential liability, which indicated that Call One faced potential exposure that would exceed coverage limits for a "reverse IFCA claim."[1] (*Id.* ¶¶ 49–50.) Again, realizing the scope of its potential exposure, Call One demanded the appointment of counsel with subject matter expertise. (*Id.* ¶ 51.) Once more, Berkley refused to do so. (*Id.* ¶ 52.) Later, in October 2019, Subpoena Counsel met with OAG attorneys to go over the claims pending against Call One.[2] (*Id.* ¶ 53.) The OAG explained that it was not Call One's failure to remit taxes and fees that formed the basis of the claims against Call One. (*Id.* ¶ 55.) Rather, the claims were based on what the OAG characterized as Call One's reckless failure to collect taxes and fees imposed by Illinois law from its customers. (*Id.* ¶¶ 54–55.) After the meeting, Subpoena Counsel advised Call One to settle the claims promptly, as litigation would be both expensive and difficult to defend. (*Id.* ¶ 57.)

Leaving Subpoena Counsel to respond to continuing document requests, Call One engaged outside counsel ("Defense Counsel") at significant expense to engage in discussions with the OAG. (*Id.* ¶¶ 58–59.) Through Defense Counsel's communications with the OAG, Call One confirmed that a complaint with claims brought under the IFCA ("IFCA Complaint") was pending

---

[1] A "reverse false claim" is a "false statement used not to obtain payments from the government, but to 'conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.'" *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 835 (7th Cir. 2011) (quoting federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(7)). The language of the IFCA mirrors the language of the FCA. *See Perez-Garcia v. Dominick*, No. 13 C 1357, 2014 WL 903114, at *4 (N.D. Ill. Mar. 7, 2014) ("IFCA claims are evaluated under standards identical to those applied in cases arising under its federal analog.").

[2] At this point, Call One had not yet been served with a formal complaint.

under seal in Illinois state court. (*Id.* ¶ 60.) While the OAG declined to provide a copy of the IFCA Complaint to Call One (as was its customary practice), Call One was nonetheless able to communicate the substance of the underlying IFCA lawsuit to Berkley. (*Id.* ¶ 61.) Berkley maintained that its duty to defend Call One in the IFCA lawsuit was separate from any duty to defend the OAG Subpoena and asserted that it had no such duty, denying that the issue of duty to defend for the IFCA lawsuit was ripe and asserting that, even if it were, the claims asserted in the sealed IFCA Complaint fell outside the Berkley Policy's coverage. (*Id.* ¶¶ 65–66.)

Meanwhile, the OAG informed Defense Counsel that the pending lawsuit against Call One would be litigated absent settlement. (*Id.* ¶¶ 60–61.) As communicated to Call One by the OAG, Call One's potential exposure in the IFCA Lawsuit (predicated on its alleged failure to collect certain taxes and fees) would be approximately $12 million. (*Id.* ¶ 56.) Moreover, this amount would be subject to trebling under the IFCA, leading to a potential exposure of around $36 million, an amount that could potentially bankrupt Call One. (*Id.* ¶¶ 56, 62.)

Given the risk of exposure, as well as the fact that the cost of defending the IFCA lawsuit would exceed Call One's coverage limits, Call One entered settlement negotiations with the OAG. (*Id.* ¶ 62.) Although Call One attempted to engage Berkley in those discussions, Berkley steadfastly insisted that it owed neither a duty to defend nor a duty to contribute to any settlement amount. (*Id.* ¶¶ 63–68.) Call One ultimately entered into a settlement agreement with the OAG without Berkley's participation. (*Id.* ¶ 69.) Under the terms of the settlement, Call One agreed to pay $2.5 million to the State. (*Id.*) In settling, however, Call One did not admit to any of the wrongdoing alleged against it. (Compl., Ex. 3, Settlement Agreement at 1, Dkt. No. 1-3.) Moreover, the settlement agreement provides no breakdown as to how the payment amount was calculated; instead, the settlement agreement states only that "Defendant will pay, subject to the

terms of this Agreement, the total sum of $2,500,000 (the 'Settlement Amount') to the State." (*Id.*

§ 2.1.)

## II.     Applicable Policy Provisions

The Berkley Policy provides corporate indemnification coverage for Call One.

Specifically, the Berkley Policy states:

> This Policy shall pay on behalf of the Insured Entity all Loss up to the Limit of Liability
> applicable to this coverage section arising from any Claim first made against the Insured
> Entity during the Policy Period and reported to the Insurer in accordance with section VII
> of the Common Policy Terms and Conditions Section of this Policy, for any actual or
> alleged Wrongful Act.

(Compl., Ex. 1, Berkley Policy at 39, Dkt. No. 1-1.) The parties do not dispute that Call One is an

Insured Entity. "Wrongful Act" is defined in the Berkley Policy as "any actual or alleged breach

of duty, neglect, error, misstatement, misleading statement, omission, or act" by Call One. (*Id.* at

41.) "Loss" is defined to include "Damages" and "Costs of Defense." (*Id.* at 39.) "Damages" is

defined to exclude:

> a. taxes, civil or criminal fines, sanctions or penalties imposed by law . . .e.
> disgorgement or restitution payment by or on behalf of any Insured, including
> disgorgement or restitution of amounts retained, obtained, or acquired by an insured
> and any settlement payment arising from any actual or alleged amount that an Insured
> improperly retained, obtained, or acquired; or f. matters which are uninsurable under
> the law pursuant to which this Policy is construed.

(*Id.* at 41.)

The Policy also provides that Berkley will cover "Costs of Defense," defined as the

"necessary fees, costs and expenses . . . resulting solely from the investigation, adjustment,

defense and appeal of a covered Claim against the Insureds." (*Id.*)

### III.    Current Litigation

Shortly after funding the $2.5 million settlement, Call One filed the present lawsuit. Call One alleges that Berkley both breached its duty to defend (by failing to provide independent counsel and cover the costs of defense beyond those associated with the OAG Subpoena) and its duty to indemnify (by denying Call One's request for contribution of the remaining limits of coverage towards the settlement). Call One also asserts a claim pursuant to Section 155 of the Illinois Insurance Code, 215 ILCS 5/155, for a statutory penalty and attorney's fees on the basis that Berkley behaved unreasonably and vexatiously in denying coverage for Call One's claims. Berkley now moves to dismiss the complaint in its entirety.

### DISCUSSION

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the Court need not accept a party's legal conclusions, and a party cannot defeat a motion to dismiss with "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (citing *Twombly*, 550 U.S. at 556).

In reviewing a motion to dismiss, the Court may properly consider any attached exhibits. *Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007) ("Taking all facts pleaded in the complaint as true and construing all inferences in the plaintiff's favor, we review the complaint and all exhibits attached to the complaint."). Typically, when there is a conflict

between the complaint and an exhibit, the exhibit controls. *Bogie v. Rosenberg*, 705 F.3d 603, 609

(7th Cir. 2013). And courts are not "bound by the party's characterization of an exhibit and may

independently examine and form its own opinions about the document." *Forrest*, 507 F.3d at 542.

The parties agree that Illinois law controls this coverage dispute. Under Illinois law, "the

construction of an insurance policy is a question of law." *Sokol & Co. v. Atl. Mut. Ins. Co.*, 430

F.3d 417, 420 (7th Cir. 2005) (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d

1204, 1212 (Ill. 1992)). "It is well settled that insurance policies are to be liberally construed in

favor of the insured and in favor of coverage." *Worley v. Fender*, 79 N.E.3d 173, 177 (Ill. App.

Ct. 2017). Thus, while a court must give unambiguous terms their "plain, ordinary, and popular

meaning," *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 508 F. Supp. 3d 249, 253 (N.D. Ill.

2020) (quoting *Central Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004)), "any

doubts and ambiguities are resolved against the insurer." *Citizens Ins. Co. of Am. v. Uncommon

LLC*, 812 F. Supp. 2d 905, 909 (N.D. Ill. 2011) (applying Illinois law) (quoting *Amerisure Mut.

Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 811 (7th Cir. 2010)).

Call One asserts that Berkley owed it both a duty to defend the IFCA claims and a duty to

indemnify the settlement amount. Because the duty to defend is broader than the duty to

indemnify, there can be no duty to indemnify if there is no duty to defend. *The Cincinnati Ins. Co.

v. Berkshire Refrigerated Warehousing, LLC*, 149 F. Supp. 3d 867, 873 (N.D. Ill. 2015) (citing

*United Nat'l Ins. Co. v. Dunbar & Sullivan Dredging Co.*, 953 F.2d 334, 338 (7th Cir. 1992)).

Only "[w]hen 'it is clear from the face of the underlying complaint that the allegations set

forth . . . fail to state facts to bring a case within, or potentially within, the coverage of the policy'

[is] there [ ] no duty to defend and no coverage." *Lagestee-Mulder, Inc. v. Consol. Ins. Co.*, 682

F.3d 1054, 1056 (7th Cir. 2012) (quoting *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting*

*Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005)). Thus, so long as "the facts alleged in the complaint fall within, or potentially fall within, the policy coverage, the insurer must defend the insured." *Am. Bankers Ins. Co. of Fl. v. Shockley*, 3 F.4th 322, 327 (7th Cir. 2021). Moreover, "any doubts about the duty to defend are resolved in favor of the insured." *Id*. (internal quotation marks omitted).

## I.    Insurability of the IFCA Claims

Berkley contends that it had neither a duty to defend nor a duty to indemnify Call One in the connection with the IFCA lawsuit because the underlying claims are uninsurable under Illinois law. As a matter of public policy, not all claims can be insured—Illinois courts have forbidden insuring against criminal fines, punitive damages, and, in some cases, civil penalties. *Mortenson v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 249 F.3d 667, 672 (7th Cir. 2001) (citing cases). Berkley maintains that the payment the OAG sought to recover through the IFCA lawsuit represents either a penalty or disgorgement of profits, both of which are uninsurable. Additionally, Berkley suggests that coverage for any claim brought pursuant to the IFCA should be barred as against public policy. The Court addresses each of these positions in turn.

### A.    IFCA Claim as a Penalty

First, Berkley asserts that a claim brought pursuant to the IFCA is uninsurable because it necessarily seeks recovery for a penalty. In Illinois, "public policy prohibits insurance against liability for punitive damages that arise out of the misconduct of the insured." *Crawford Labs., Inc. v. St. Paul Ins. Co. of Ill.*, 715 N.E.2d 653, 659 (Ill. App. Ct. 1999) (citing *Beaver v. Country Mut. Ins. Co.*, 420 N.E.2d 1058, 1060–61 (Ill. App. Ct. 1981)). And at least one Illinois court has found that a civil penalty operates analogously to punitive damages. *See Crawford Labs*, 715 N.E.2d at 659. Berkley contends that the underlying IFCA Lawsuit against Call One sought (and

ultimately obtained through settlement) nothing more than this type of uninsurable penalty. In support, Berkley points to the language of the IFCA, which refers to penalties as a remedy for a violation of its terms.

Yet penalties are not the only remedy available under the IFCA. Instead, the IFCA provides that an individual who violates it is "liable to the State for a civil penalty [tied to the federal False Claims Act], *plus* 3 times the amount of damages which the State sustains because of the act of that person." 740 ILCS 175/3(a) (emphasis added). "Plus," of course, is an additive conjunction. The unambiguous words of the statute therefore provide for penalties *along with* damages. Accordingly, courts award both damages and penalties in connection with false claims actions. *See United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 738–42 (N.D. Ill. 2007) (affirming a jury's grant of both compensatory damages and civil penalties under the FCA).[3] Although Berkley frequently repeats that the damages sought by the OAG in connection with the underlying lawsuit must have been a penalty because the IFCA provides for penalties, it ignores that the IFCA authorizes two forms of relief, one of which is *not* a penalty.

Perhaps recognizing that the statutory language allows dual relief, Berkley maintains that any sum sought by the OAG could not constitute damages because Call One "never owed" the taxes and fees to Illinois. Basically, Berkley takes the position that the State could not have been harmed by Call One's failure to collect taxes and fees because Call One was never the responsible party for the payment of those taxes and fees. Berkley believes that because the taxes and fees were meant to be paid by Call One's customers, Call One could only ever be assessed a penalty. But the IFCA Complaint explicitly states that Call One had a legal obligation to collect and remit

---

[3] For purposes of this analysis, the Court looks to cases interpreting not just the IFCA but also the federal FCA. Illinois courts have noted that the IFCA "closely mirrors" the federal FCA. *Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 557 (Ill. 2005). As such, "[c]laims pursuant to the IFCA are analyzed like those under the federal False Claims Act." *Cunliffe v. Wright*, 51 F. Supp. 3d 721, 740 (N.D. Ill. 2014).

those taxes. While Call One could have passed on the costs of those taxes and fees to its customers, Call One was statutorily obligated to collect them. *See* 35 ILCS 630/4; 636/5–40; 635/25. In other words, Call One was liable for the collection of those taxes and fees even ***before*** a penalty was imposed. Therefore, Call One could face liability not just for a penalty but also for the uncollected revenue owed to the State. This is confirmed by the IFCA Complaint, which seeks relief in both the form of damages for the unpaid taxes and civil penalties. (*See* Compl., Ex. 2, IFCA Compl. ¶¶ 68–73, Dkt. No. 1-2.)

Berkley also suggests that whether the sum sought by the OAG was calculated in reference to the State's harm is immaterial to the determination of whether the amount was meant to represent a penalty or damages. That is because, in Berkley's view, the amount of taxes and fees owed is simply how a penalty is calculated under the IFCA. This is incorrect. The IFCA explicitly provides that a civil penalty is to be "not less than the minimum amount and not more than the maximum amount allowed for a civil penalty for a violation of the federal False Claims Act." 740 ILCS 175/3(a)(1). Contrary to Berkley's suggestion, this is a set number uncoupled from the amount of taxes and fees owed by the violator. And again, the IFCA Complaint confirms that the OAG's requested penalty was tied to a specific statutory range, not the amount of uncollected taxes. (*See* Compl., Ex. 2, IFCA Compl. ¶ 71 (stating that violators of the IFCA are required to pay a civil penalty of not less than $5,500 and not more than $11,000 for each violation).) In sum, Call One is correct that under the IFCA it is damages, not penalties, that are calculated in reference to the State's lost revenue.

Berkley essentially asserts that because the IFCA provides for relief in the form of a penalty, Call One must be seeking coverage for a penalty. But Berkley ignores the plain language of the statute, which allows for remedies in the form of both damages and penalties, and that the

10

complaint and attached exhibits confirm that penalties were only one form of relief sought against Call One. Therefore, to the extent Berkley's motion to dismiss is predicated on the assumption that Call One only faced liability in the form of the penalty, it must be denied.

### B. IFCA Claim as Disgorgement

Next, Berkley insists that there can be no coverage for the IFCA lawsuit because any relief sought that was not a penalty was disgorgement of improperly obtained profits. Disgorgement generally is understood as "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." *Disgorgement*, Black's Law Dictionary (11th ed. 2019). The "primary purpose of disgorgement orders is to deter violations of the . . . laws by depriving violators of their ill-gotten gains." *Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017). The focus of disgorgement as a remedy typically is on the benefit accrued to the violator rather than the harm incurred by any victim of its actions. In contrast, compensatory damages focus on the loss to the victim, not the profit to the violator. *Saccameno v. U.S Bank Nat'l Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019) (describing how "[c]ompensatory damages seek to make the plaintiff whole and to redress the wrongs committed against her").

Courts have held that claims for disgorgement cannot be insured as a matter of public policy. *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Village of Franklin Park*, 523 F.3d 754, 756–57 (7th Cir. 2008) (applying Illinois law and finding no duty to defend where the underlying complaint sought only the payment of wrongfully retained funds, describing any such loss as only the restoration of an ill-gotten gain, which is uninsurable by law). That is because "in cases where the plaintiff is seeking restitution of the defendant's improper gain . . . [imposing coverage] would be 'asking insurance companies to pick up the tab' for monies the insured should have never received in the first place." *St. Paul Fire & Marine Ins. Co. v. Prairie Title Servs., Inc.*, No. 04 C

4178, 2005 WL 2850121, at *3 (N.D. Ill. Oct. 26, 2005) (quoting *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001)). As such, if all non-penalty relief sought in the IFCA lawsuit were exclusively a request for disgorgement, Call One's claims would be uninsurable as a matter of law.

To this end, Berkley labels the relief sought against Call One as disgorgement, insisting that any amount paid by Call One would necessarily be the return of ill-gotten profits. This description is based on a theory of the underlying conduct alleged in the IFCA lawsuit—namely, that Call One excluded the relevant taxes and fees as part of a scheme to lower its competitive bids, undercut its competitors, and expand its business (and accordingly, increase its profits)—and premised upon Berkley's own interpretation of the facts. But at the motion to dismiss stage of this lawsuit, the allegations in the complaint must be viewed in the light most favorable to the plaintiff. And here, although Berkley states that Call One's underlying conduct was both profit-motivated and successful in increasing those profits (such that there were profits to be disgorged), Call One's complaint alleges no such facts. Nor does the IFCA Complaint attached uncontrovertibly establish that narrative. The IFCA Complaint does not ascribe any motive to Call One, let alone state that Call One excluded the taxes for the purposes of increasing its business.[4] In fact, not only does the IFCA Complaint never mention any profits obtained by Call One as a result of its failure to collect and remit taxes, but it also does not state that Call One benefited in any manner. Nor does Call

---

[4] The IFCA Complaint does allege that Call One submitted bid sheets to potential customers showing that Call One would not charge the same taxes and fees as did their competitors. (Compl., Ex. 2, IFCA Compl. ¶¶ 37–38.) However, while the IFCA does have a knowledge requirement, this element can be met if a person "acts in reckless disregard of the truth or falsity of the information," and the "knowingly" element under the IFCA "require[s] no proof of specific intent to defraud." 740 ILCS 175/3(b)(1). As such, the allegations in the IFCA Complaint also support a version of events in which Call One excluded the taxes and fees not because it intended to fraudulently underbid competitors but out of a recklessly mistaken belief that it did not have to include them. Under that view, that Call One was aware its competitors were charging the taxes and fees need not exclusively be understood as offered in support of a profit motive. It might also demonstrate that Call One should have been on notice that its own approach was incorrect.

One indicate in its own complaint in this lawsuit that the amount by which Call One profited was ever brought up in discussions with the OAG. Altogether, Berkley's assertion that the IFCA lawsuit was brought solely to disgorge profits is unsupported by either the Complaint or its attached exhibits.

Instead, the IFCA Complaint confirms that the OAG sought compensation for the State's loss, not disgorgement of profits. As the IFCA Complaint clearly states, damages were calculated based on the amount of unremitted taxes over the statutory period, not based on any profit obtained by Call One. (*See* Compl., Ex. 2, IFCA Compl. ¶ 69 (calculating damages in the range of $12 to $15 million, before mandatory trebling, by determining that Call One failed to collect $2 to $2.5 million in taxes on an annual basis and multiplying that amount by the six-year statutory period).) Any damages sought by the OAG were not based on a determination of Call One's ill-gotten gains, as required for disgorgement, but tethered directly to the State's lost revenue. And Berkley does not appear to dispute that, even if Call One failed to realize any financial gain from the alleged scheme, the State would still be entitled to damages.[5]

Moreover, the IFCA provides for compensatory damages or actual loss, not disgorgement, as a remedy. *See United States ex rel. Chandler v. Cook County*, 277 F.3d 969, 978 (7th Cir. 2002) *aff'd*, 537 U.S. 119 (2003) (noting that the FCA allows for trebling of the "actual loss" caused by the violator's conduct). The IFCA itself provides for "3 times the amount of damages

___

[5] In contrast, the authorities cited by Berkley involve situations in which the disputed payment was uncontrovertibly calculated by reference to the insured's gain. *See Level 3*, 272 F.3d at 9111 (7th Cir. 2001) (finding that the damages sought by the plaintiffs against the insured in the underlying litigation "[sought] to deprive the defendant of the net benefit of the unlawful act, the value of the unlawfully obtained stock minus the cost to the defendant of obtaining the stock"); *Diamond Residential Mortg. Corp. v. Liberty Surplus Ins. Corp.*, No. 19-cv-06439, 2020 WL 7027652, at *4 (N.D. Ill. Nov. 30, 2020) (noting that the insured paid the state agency "pursuant to a statutorily authorized fine not tethered to the actual loss suffered by the victims of [the insured's] misconduct, indicating that the payment was a penalty and a fine")

which **the State sustains because of the act of that person**." 740 ILCS 175/3(a)(1) (emphasis

added). Thus, the IFCA's plain language authorizes compensatory relief, not disgorgement. *See,*

*e.g.*, *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 702 (7th

Cir. 2014) (describing the damages awarded for a FCA action as compensatory damages); *United*

*States ex rel. Chandler v. Hektoen Inst. for Med. Rsch.*, 35 F. Supp. 2d 1078, 1085–86 (N.D. Ill.

1999) (explaining why damages, even trebled, under the FCA are compensatory and not punitive).

The compensatory nature of the damages in false claims actions is not changed even with trebling.

*Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003) (emphasizing that the

treble damages provision "ha[s] a compensatory side, serving remedial purposes in addition to

punitive objectives").

Beyond labelling such damages as compensatory, courts use a compensatory framework to

calculate damages for claims brought pursuant to the IFCA. *See United States v. Bornstein*, 423

U.S. 303, 314 (1976) (holding that in computing damages under the FCA, the Government's

actual damages must be multiplied before any subtractions for compensatory payments are made

and calculating the Government's damages by the replacement cost); *United States v. Anchor*

*Mortg. Corp.*, 711 F.3d 745, 749–51 (7th Cir. 2013) (holding that the FCA requires a calculation

of net loss, which, in this case involving false applications for federal guarantees of loans, was the

difference between the value of the guaranty the United States paid less the value of the

collateral). Indeed, one issue courts often face in calculating the proper amount of damages is

whether separate compensatory payments should be deducted prior to mandatory trebling of

damages. *See, e.g. People ex rel. Schad, Diamond & Shedden P.C. v. My Pillow, Inc.*, 82 N.E.3d

627, 641–45 (Ill. App. Ct. 2017) (facing the question of whether pre-judgment compensatory

payments should be deducted before or after mandatory trebling).

Furthermore, courts around the country have confirmed the compensatory nature of damages for false claims actions. *See, e.g.*, *United States ex rel. Taylor v. Gabelli*, No. 03 CIV 8762(PAC), 2005 WL 2978921, at *3–14 (S.D.N.Y Nov. 4, 2005) (applying statutory interpretation, looking to the legislative history, and examining FCA jurisprudence to determine that the FCA limits recovery to civil penalties and compensatory damages and does not provide for a mechanism to disgorge ill-gotten gains). Similarly, courts have rejected the position that damages for false claims actions should be measured by the defendant's gain (disgorgement) as opposed to the State's loss (compensatory damages). *See Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*, No. 17-cv-08220, 2021 WL 4711503, at *14–15 (N.D. Ill. Oct. 8, 2021) (finding that the "FCA allows only for civil penalties and compensatory damages, not for restitution in the form of disgorgement of the violator's unjust gains"). Indeed, the Supreme Court (as well as circuit court decisions) has "consistently recognized that the purposes of the FCA . . . were essentially compensatory." *United States ex rel. Rosales v. S.F. Housing Auth.*, 173 F. Supp. 2d 987, 1013 (N.D. Cal. 2001) (citing cases).

In short, the Court finds that the claims faced by Call One in the IFCA lawsuit were claims for compensatory relief, not disgorgement of profits. Accordingly, those claims were not uninsurable as a matter of Illinois law.

### C.     IFCA Claim as Against Public Policy

Finally, Berkley suggests that reverse false claims actions brought pursuant to the IFCA should be uninsurable as matter of law regardless of the nature of the relief sought. Berkley submits that "fraud" of the sort underlying an IFCA claim cannot constitute a "Wrongful Act" so as to trigger coverage because such coverage would allow insureds to insure the proceeds of that wrongdoing. For instance, Berkley argues that allowing coverage would tempt insureds to forgo

remitting taxes because they could simply fall back on their insurer when caught and retain the benefit of their misdeeds. But again, Berkley's position rests upon the assumption that the IFCA claims sought a form of disgorgement. Berkley insists that Call One is seeking to insure the proceeds of Call One's fraudulent actions. The IFCA lawsuit, however, was premised not only on Call One's failure to remit taxes (that is, Call One's improper retention of collected taxes) but also its failure to collect those taxes in the first instance. Although Berkley assumes Call One profited by the exact amount of uncollected taxes, there is nothing in the pleadings to suggest that Call One realized any personal gain from its actions. Even had Call One profited, IFCA claims are compensatory in nature—coverage for such claims would insure not ill-gotten gains but rather the harm inflicted upon the State.

Berkley relies heavily on *Mortenson* for the proposition that it is against public policy to provide coverage for a failure to pay taxes. But *Mortenson* is inapposite. There, the Seventh Circuit found that no coverage existed for a settlement that the insured, a corporate officer, entered into with the Internal Revenue Service ("IRS") after the IRS sought to assess a penalty against him for the knowing and willful withholding of payroll taxes. *Mortenson*, 249 F.3d. at 669. That holding was predicated on the finding that the past-due taxes sought constituted a penalty that was excluded by the terms of the policy.[6] But this simply goes to the question of whether penalties are uninsurable under Illinois law, not whether any action in which the conduct alleged involved the non-payment of taxes is uninsurable.

---

[6] Although Berkley characterizes the remedy sought in *Mortenson* as a form of disgorgement, the statute at issue explicitly states that an individual who violates its terms is "liable to a ***penalty*** equal to the total amount of tax evaded, or not collected or not accounted for a paid over." *Mortenson*, at 669 (emphasis added).

It is true that, in *dicta*, the Seventh Circuit noted that it was "strongly arguable" that allowing coverage for the wrongdoing at issue was against public policy because it resulted in a moral hazard.[7] *Id.* at 672. In *Mortenson*, the insured, a corporate officer of a struggling company, failed to remit payroll taxes and instead used those funds to repay other, more pressing creditors. *Id.* at 669. As the Seventh Circuit explained, because corporate officers face pressure to use the company's dwindling funds to pay the most demanding creditors, by the time the IRS attempts to collect delinquent taxes, there are no more funds left to pay the government. *Id*. at 671–72. Recognizing this problem, Congress imposed a penalty upon responsible officers to help make certain that the IRS would not always be at the back of the line of creditors. *Id.* at 672. To insure officers against this penalty would, in essence, allow officers to evade this penalty completely and undo the incentive structure Congress has created. *Id.* Because the only liability the officers faced was the penalty, coverage would ensure that they faced no consequences for the wrongdoing. Only when insurance coverage would result in this type of "severe moral hazard," such that the insured is incentivized to commit the act insured against because they can reap the entirety of the benefit without sowing any of the harms, do courts find coverage against public policy. *Hartford Cas. Ins. Co. v. Karlin, Fleisher & Falkenburg, LLC*, 822 F.3d 358, 360 (7th Cir. 2016).

Coverage for cases involving fraud, however, does not result in this level of moral hazard. While *Mortenson* lists several types of insurance as being against public policy due to the severity of the moral hazard insurance induces, fraud is not among them. *See Astellas*, 2021 WL 4711503, at *20 (emphasizing that fraud is not among the kinds of insurance *Mortenson* listed as being against public policy (citing *Mortenson*, 249 F.3d at 672)). To the contrary, courts have found

---

[7] A moral hazard is a situation in which the person bearing the risk will not bear the costs of the behavior. *Amerisure Ins. Co. v. Nat'l Sur. Corp.*, 695 F.3d 632, 635 (7th Cir. 2012).

coverage for claims where the underlying conduct involves fraud. *See, e.g.*, *OneBeacon Am. Ins. Co. v. City of Zion*, 119 F. Supp. 3d 821, 834–37 (N.D. Ill. 2015) (determining that an insurer had a duty to defend certain individual defendants because fraud and civil conspiracy claims fell outside the bounds of a policy's exclusions). When coverage does not exist, it is not because covering damages for an insured's fraudulent act would impermissibly encourage the insured to commit that act but rather the policy's language explicitly excludes coverage for such conduct. *See, e.g.*, *Conn. Indem. Co. v. DER Travel Serv., Inc.*, 328 F.3d 347, 348, 351 (7th Cir. 2003) (finding no coverage where the policy excluded coverage for "liability arising out of any act, error, or mission which is willfully dishonest, fraudulent, or malicious, or in willful violation of any penal or criminal statute" because the underlying lawsuit alleged an intentional scheme to defraud); *Gen. Star Nat'l Ins. Co. v. Adams Valuation Corp.*, 69 F. Supp. 3d 742, 746–49 (N.D. Ill. 2014) (holding that there was no duty to defend Racketeer Influenced and Corrupt Organizations Act and fraud claims when those claims fell within the scope of an exclusion for any claims arising out of dishonest, fraudulent, criminal, or malicious acts or omissions, as well as intentional misrepresentation). Perhaps recognizing the concerns that Berkley now raises in connection with the IFCA claims against Call One, insurers regularly include exclusions for intentional acts or fraudulent misrepresentations.

In fact, the Berkley Policy itself already contains exclusions for losses resulting from fraud. In the "Exclusions" section of the Berkley Policy, it states that Berkley shall not be "liable to make any payment for Loss in connection with a Claim made against any Insured:

> (B) based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, however, this exclusion shall not apply unless a judgment or other final adjudication adverse to any of the Insureds in such Claim shall establish that such Insureds committed such criminal or deliberate fraudulent act . . .[8]

---

[8] The Berkley Policy contains a similar exclusion for losses "involving the gaining of any profit or

18

(Compl., Ex. 1, Berkley Policy at 42.) Therefore, had the IFCA lawsuit ended in a final adjudication determining that Call One had committed the alleged fraudulent acts, the Berkley Policy would bar coverage of the resulting payment to the State. But the Berkley Policy's exclusions, by their terms, do not apply to the present situation, where no such final adjudication has occurred.

So long as the underlying IFCA claims are not uninsurable as a matter of law, Call One has presented a claim for coverage for both damages and its cost of defense that falls within the boundaries of the Berkley Policy.[9] As the Court has explained, the IFCA claims are not uninsurable as a matter of law. If Berkley believed such claims to be too risky to cover, it could have drafted its policy terms accordingly. The Court, however, will not go outside the language of the policy to fill in this gap for Berkley (the insurer), against Call One (the insured). *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp., Inc.*, 785 F. Supp. 2d 722, 727 (N.D. Ill. 2011) ("[I]f a policy term is ambiguous, a court must construe the policy 'strictly against the insurer, who drafted the policy, and liberally in favor of coverage for the insured.'" (quoting *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 286 (Ill. 2006))).

---

advantage to which an Insured was not legally entitled." (Compl., Ex. 1, Berkley Policy at 42.)

[9] The damages recoverable against Call One included covered damages, not just penalties or disgorgement (which are both uninsurable under Illinois law and, the Court notes, expressly excluded from the definition of damages in the Berkley Policy). Berkley's responsibility to cover Call One's costs of defense is triggered merely by a "Wrongful Act." Berkley's only argument as to why the underlying conduct alleged in the IFCA lawsuit would not be considered a "Wrongful Act" is that the Berkley Policy does not contemplate or insure against fraud, as recovery in such actions will always be a form of disgorgement. Berkley's error in categorizing damages in fraud actions as necessarily a form of disgorgement has already been discussed above. Nothing in the language of the Berkley Policy excludes fraud from the definition of a "Wrongful Act." Instead, the conduct alleged in the IFCA lawsuit—misstatements or misleading statements to customers concerning the exemption for taxes and fees, as well as the Call One's alleged breach of their duty to collect and remit those taxes—falls within the Berkley Policy's definition of "Wrongful Act."

For the forgoing reasons, the Court finds that coverage of the IFCA lawsuit was not against Illinois law. Accordingly, Berkley's motion to dismiss Count I is denied.

## II. Definition of "Loss"

Additionally, Berkley contends that Call One's claim does not constitute a "Loss" as defined in the Berkley Policy because it seeks to recover damages for penalties and disgorgement. The definition of "damages" excludes coverage for these types of losses. For the reasons discussed above, however, the underlying IFCA lawsuit against Call One did not seek disgorgement of ill-gotten gains. Nor is it necessarily true that the relief under the IFCA was limited solely to civil penalties. Accordingly, the exclusions included in the damages definition do not apply.

## III. Section 155

Finally, Berkley contends that, even if the Court allows Call One to proceed with its breach of contract claim, Call One's claim for bad faith denial of coverage pursuant to 215 ILCS 5/155 must nonetheless be dismissed. Section 155 provides "an extracontractual remedy to policy-holders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1023 (7th Cir. 2013) (quoting *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 900 (Ill. 1996)). As a matter of law,

> an insurer does not act vexatiously or unreasonably when: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.

*Scottsdale Ins. Co. v. City of Waukegan*, No. 07 C 64, 2007 WL 2740521, at *3 (N.D. Ill. Sept. 10, 2007). Berkley asserts that, because the pleadings demonstrate that it reasonably relied on available evidence and that there existed a bona fide dispute as to whether Call One was entitled to coverage, Call One's claim must be dismissed.

20

Under Illinois law, however, courts "must consider the totality of the circumstances" to determine whether an insurer's conduct violated Section 155 *W. Wind Exp. v. Occidental Fire & Cas. Co. of N.C.*, No. 10-cv-6263, 2013 WL 2285799, at \*2 (N.D. Ill. May 23, 2013) (quoting *Golden Rule Ins. Co. v. Schwartz*, 786 N.E.2d 1010, 1018 (Ill. 2003)). "Simply pleading that the insurer knowingly and intentionally refused to provide insurance coverage and that the insurer's refusal was and continues to be vexatious and unreasonable, without some modicum of factual support, is insufficient to plausibly suggest that the insured is entitled to relief under the statute." *Wheeler v. Assurant Specialty Prop.*, 125 F. Supp. 3d 834, 841 (N.D. Ill. 2015) (internal quotation marks omitted). But so long as the plaintiff does more than just recite the elements of the cause of action, typically "because [the Section 155] inquiry presents a factual question, the Court may not decide the issue on the pleadings alone." *W. Wind*, 2013 WL 2285799 at \*4 (internal quotation marks omitted).

Here, Call One points to a list of allegations that it claims shows Berkley's unreasonable and vexatious conduct, including Berkley's failure to provide independent counsel despite the conflict of interest created by its coverage positions, Berkley's determination that there was no "claim" against Call One even after being presented with the information that a complaint had been filed, and Berkley's refusal to participate in the settlement conference with the OAG on the grounds that no claim for monetary relief was pending against Call One. Because Call One does more than just label Berkley's denial of coverage as unreasonable and actually provides examples of acts it deems vexatious, it is premature for the Court to decide the merits of this claim, before discovery into Berkley's entire course of conduct has occurred. Accordingly, Berkley's motion to dismiss Count II is denied as well.

**CONCLUSION**

For the reasons given above, Berkley's motion to dismiss (Dkt. No. 12) is denied.

ENTERED:

Dated:  February 25, 2022

_____
Andrea R. Wood
United States District Judge