**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CALL ONE INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counter-Defendant, | ) | |
| | ) | No. 21-cv-00466 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| BERKLEY INSURANCE CO., | ) | |
| | ) | |
| Defendant and | ) | |
| Counter-Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff and Counter-Defendant Call One Inc. ("Call One"), a telecommunications

business, filed this lawsuit against Defendant and Counter-Plaintiff Berkley Insurance Company

("Berkley") after Berkley refused to pay Call One's defense costs and denied coverage for an

action brought against Call One by the Office of the Illinois Attorney General ("OAG") for

alleged violations of the Illinois False Claims Act ("IFCA"), 740 ILCS 175/1 *et seq*. After the

Court denied Berkley's motion to dismiss Call One's claims for breach of contract and bad faith

denial of coverage, Berkley asserted a counterclaim against Call One, seeking rescission of the

insurance contract based on alleged misrepresentations in the policy renewal application. Now

before the Court are the parties' respective motions for summary judgment. Contending that

Berkley had both a duty to defend and a duty to indemnify the IFCA claims, Call One seeks

partial summary judgment, asking the Court to find Berkley liable for breach of contract (Count

I) and bad faith denial of coverage (Count II). (Dkt. No. 61.) With its cross-motion, Berkley

seeks summary judgment as to its counterclaim for recission. (Dkt. No. 64.) For the reasons

stated below, the Court grants Berkley's motion and denies Call One's motion.

## BACKGROUND

The following facts are drawn from the parties' submissions pursuant to Local Rule 56.1. They are undisputed unless otherwise noted.

### I.     OAG Subpoena and Underlying Litigation

Call One provides telecommunications services. (Def.'s Resp. to Pls.' Statement of Material Facts ("DRPSMF") ¶ 1, Dkt. No. 66.) From 2011 through 2018, Call One purchased professional liability insurance with a coverage limit of $2,000,000 from Berkley and its affiliate, the Carolina Casualty Insurance Company. (Pls.' Resp. to Defs.' Statement of Material Facts and Additional Facts ("PRDSMF") ¶ II.1, Dkt. No. 68.) In June 2018, Call One renewed its previous insurance policy ("Policy") for the period June 30, 2018, through June 30, 2019. (*Id.* ¶ II.4.)

On September 17, 2018, a *qui tam* action against Call One ("IFCA Action") was filed under seal in the Circuit Court of Cook County, Illinois. (DRPSMF ¶ 18.) The complaint alleged that Call One violated the IFCA by failing to collect and remit certain excise taxes and infrastructure maintenance fees owed by its customers. (*Id.* ¶ 19.) Later, in March 2019, the OAG served a subpoena *duces tecum* ("OAG Subpoena") pursuant to the IFCA to obtain documents related to Call One's collection and payment of Illinois taxes. (*Id.* ¶¶ 21, 22.) In response, Call One requested that Berkley cover its defense costs. (*Id.* ¶ 24.) Berkley eventually provided counsel but emphasized that coverage would not extend beyond Call One's compliance with the OAG Subpoena. (*Id.* ¶ 29.) Dissatisfied with this limitation, Call One requested independent counsel for matters related to the OAG's broader investigation. (*Id.* ¶¶ 29, 32.) When Berkley refused, Call One engaged independent counsel at its own expense, leaving one attorney to respond to the subpoena and others to defend against the investigation. (*Id.* ¶ 33.)

In March 2020, Call One learned that the OAG Subpoena originated from the IFCA Action, which remained under seal. (*Id.* ¶ 36.) After calculating its potential exposure, along with

the cost of defending the IFCA Action, Call One entered settlement negotiations with the OAG. (*Id.* ¶¶ 37, 39.) Berkley by and large continued to refuse coverage, maintaining that the unsealed IFCA Action did not constitute a "claim" within the meaning of the Policy. (PRDSMF ¶ 52.) It did, however, offer $400,000 towards the OAG settlement in exchange for a full and final release of claims from Call One. (*Id.* ¶ 62.) Call One declined Berkley's offer and, after months of negotiations, reached a settlement agreement with the State. (*Id.* ¶¶ 62, 65.) Under the settlement terms, Call One agreed to pay $2,500,000 plus reasonable attorneys' fees to resolve the IFCA Action and the OAG investigation. (*Id.* ¶ 67.) In the end, Berkley did not indemnify Call One against either component of the award. (DRPSMF ¶¶ 42, 44.)

## II.     Events Relevant to Berkley's Counterclaim

According to Berkley, certain Call One employees were aware that Call One's exemption of governmental or non-profit entities from state and local excise taxes might be improper. (PRDSMF ¶ 71.)[1] In 2010, Call One salesperson John Havis received an email from a potential customer—the Village of Tinley Park—stating that based on information provided by the Illinois Department of Revenue, Tinley Park understood that it could not be properly exempted from certain taxes, notwithstanding Call One's assertion to the contrary. (*Id.* ¶¶ 78, 80.) Later, Havis contacted the Illinois Department of Revenue about this issue and was told that no entity is exempt from excise taxes. (*Id.* ¶ 82.) Havis relayed Tinley Park's concerns to other Call One employees, including his supervisor, Joey Waxman. (*Id.* ¶ 92.) Nevertheless, Havis continued to advertise tax exemptions to customers, even though he believed them to be improper, because it was, in his view, management's command. (*Id.*)

---

[1] Although Call One denies that offering such exemptions was its standard business practice, it admits that if a governmental or non-profit entity provided Call One with an exemption form, Call One would not collect state or local taxes from that customer. (PRDSMF ¶ 71.)

Unbeknownst to Berkley, the City of Chicago started auditing Call One's financial records in 2016. (*Id.* ¶ 100.)[2] The retrospective audit, which lasted four years, investigated Call One's remittance of various types of local taxes from 2009 until 2014. (*Id.* ¶¶ 100–106.) In connection with the audit, and at the City of Chicago's behest, Call One signed a "Consent to Waive Statute of Limitations" form—first in 2016, and again in 2017 and 2018. (*Id.* ¶¶ 101–104.) Pursuant to its terms, Call One agreed to "waive any applicable statute of limitations (and any right to assert a statute of limitations defense) respecting liability" for each specific tax under review. (*Id.* ¶¶ 102–104.) Ultimately, the audit ended in 2020 when Call One entered into a settlement agreement with the City of Chicago. (*Id.* ¶ 100.) Although Call One did not admit any wrongdoing, it agreed to pay the City of Chicago $360,000—an amount that constituted approximately half of Call One's alleged liability with respect to two of the four audited tax types. (*Id.* ¶ 107.)

Separate from the IFCA Action and the City of Chicago audit, Call One failed to remit taxes in states other than Illinois.[3] Call One's Chief Financial Officer ("CFO") Sandra Bragg-O'Connor first noticed this issue in 2017; weeks later, she informed Chris Surdenik, the President of Call One, and Edward Wynn, its Executive Chairman, that Call One's failure to remit these taxes could result in financial exposure—a point she reiterated in February 2018 during Call One's board of directors meeting. (*Id.* ¶¶ 108–112.) In an effort to resolve its noncompliance in other states, Call One engaged two tax advisory firms. (*Id.* ¶¶ 114, 116.) From

---

[2] While there is no genuine dispute as to the facts detailed in this paragraph, Call One objects on the basis of relevance. Specifically Call One argues that because Berkley's counterclaim does not contain allegations related to the City of Chicago audit, any reference thereto is improper. For the reasons explained in Section I.B below, Call One's objection is overruled.

[3] Call One admits that it failed to remit required taxes in other states. (*Id.* ¶ 114.) But it nonetheless objects on the basis of relevance, arguing that because Berkley's counterclaim does not contain allegations related to Call One's failure to remit taxes in states other than Illinois, it cannot reference those events. For the reasons explained in Section I.B below, Call One's objection is overruled.

February 2018 until at least June 2018, one of the firms assisted with voluntary tax disclosures. (*Id.* ¶ 115.) And beginning in May 2018, the other firm performed routine tax reporting. (*Id.* ¶ 116.) As with the City of Chicago audit, Berkley was not aware of these events until this litigation commenced.

### III.    Applicable Policy Provisions

Several Policy provisions are central to this dispute. As an initial matter, the Policy provides corporate indemnification coverage for Call One. Specifically, it provides that:

> This Policy shall pay on behalf of the Insured Entity all Loss up to the Limit of Liability applicable to this coverage section arising from any Claim first made against the Insured Entity during the Policy Period and reported to the Insurer in accordance with section VII of the Common Policy Terms and Conditions Section of this Policy, for any actual or alleged Wrongful Act.

(DRPSMF ¶ 7.) A "Wrongful Act" is defined as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission, or act." (*Id.* ¶ 15.) "Related Wrongful Acts" are "Wrongful Acts which are the same as, related or continuous or that are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision." (*Id.* ¶ 16.) With respect to "Related Wrongful Acts," the policy further provides:

> All Claims based upon or arising out of the same Wrongful Act or any Related Wrongful Acts, or one or more series of any similar, repeated or continuous Wrongful Acts or Related Wrongful Acts, shall be considered a single Claim. Each Claim shall be deemed to be first made at the earliest of the following times:
>
> 1. when the earliest Claim arising out of such Wrongful Act or Related Wrongful Acts was first made; or
>
> 2. when notice pursuant to section VII. B. above of a fact, circumstance or situation giving rise to such Claim is given.

(*Id.* ¶ 17.) What constitutes a "Claim" is also pertinent. In relevant part, the policy defines a "Claim" as:

1. a written demand for monetary or non-monetary relief, including but not limited to, any demand for mediation, arbitration, or other alternative dispute resolution process, arising from a Wrongful Act; or

2. a civil, criminal, administrative or arbitration proceeding for monetary or non-monetary relief filed against an Insured arising from a Wrongful Act which is commenced by: (a) service of a complaint or similar pleading; (b) return of an indictment, information or similar document; or (c) receipt or filing of a notice of charges; or

3. a written request made by a claimant to the Named Insured to toll or waive the statute of limitations for any Wrongful Act.

(*Id.* ¶ 13.) By endorsement, this definition was amended to add that a "Claim means a formal civil, criminal, administrative or regulatory investigation of an Insured Person but only after such Insured Person is identified in writing by the investigating authority as a person against whom such proceeding described above may be commenced." (*Id.* ¶ 14.)

Under the Policy, an Insured Entity's "Loss" includes "Costs of Defense" and "Damages." (*Id.* ¶ 10.) "Costs of Defense" are the "necessary fees, costs and expenses . . . resulting solely from the investigation, adjustment, defense and appeal of a covered Claim against the Insureds." (*Id.* ¶ 12.) "Damages," meanwhile, include monetary settlements but exclude:

a. taxes, civil or criminal fines, sanctions or penalties imposed by law . . . e. disgorgement or restitution payment by or on behalf of any Insured, including disgorgement or restitution of amounts retained, obtained, or acquired by an insured and any settlement payment arising from any actual or alleged amount that an Insured improperly retained, obtained, or acquired; or f. matters which are uninsurable under the law pursuant to which this Policy is construed.

(*Id.*)

Among other exclusions, the Policy includes the following Professional Services Exclusion to coverage:

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured: . . . based upon, arising out of, directly or

6

indirectly resulting from or in consequence of, or in any way involving the
performance of any professional services for others, and caused by any act, error
or omission . . . .

(*Id.* ¶ 120.)

Lastly, the Policy provides, in relevant part, that "[i]t is agreed by the Insureds that the
statements in the Proposal are their material representations and that this Policy is issued in
reliance upon the truth and accuracy of such statements" ("Materiality Provision"). (*Id.* ¶ 118.)

### IV.    Call One's Alleged Misrepresentations

According to Berkley, Call One's 2018 Renewal Application contains several
misrepresentations. When Call One first sought insurance coverage from Berkley in 2011, the
application form asked if Call One was "aware of any fact, circumstance or situation involving
any Insureds that might reasonably be expected to result in a Claim." (PRDSMF ¶¶ II.1–II.2.)
Call One answered "No." (*Id.* ¶ II.2.) In subsequent years, Call One executed policy renewal
applications that each included the following question: "Within the last 12 months, has there
been any change in the status of any claims, loss or circumstance reported in any application
previously submitted to the Insurer?" (*Id.* ¶ II.5.) Call One answered "No" in 2015 and 2017.
(*Id.* ¶ II.3.)  Notwithstanding the City of Chicago audit, and its tax remittance issues, Call One
did not check the "Yes" or "No" box in 2018, instead leaving the response field blank. (*Id.*
¶¶ II.4–5.) [4] According to the underwriter assigned to Call One's account, Berkley relied on the
2018 Renewal Application to provide terms to Call One for the 2018–2019 policy period. (*Id.*
¶ II.7.)

---

[4] Although Call One admits that it did not check either box, it denies that it failed to provide the requested
information, explaining that it attached to the 2018 Renewal Application an update regarding two claims
made during the 2017 policy period. (*Id.* ¶ 5.) The Court notes, however, that neither of those claims or
the attendant updates concerned the audit or its tax remittance issues.

### V.     Current Litigation

Now before the Court are the parties' cross-motions for summary judgment. Call One's motion for partial summary judgment asserts that Berkley should be found liable for breach of contract as a matter of law. Specifically, Call One contends that Berkley breached its duty to defend by failing to provide independent counsel and cover the costs of defense beyond those associated with the OAG Subpoena and, furthermore, breached its duty to indemnify by denying Call One's request for contribution of the remaining limits of coverage towards the settlement. In addition, Call One seeks summary judgment as to its second count, arguing that Berkley violated Section 155 of the Illinois Insurance Code, 215 ILCS 5/155, by behaving unreasonably and vexatiously in denying coverage for Call One's claims. After the Court denied Berkley's motion to dismiss, Berkley asserted a counterclaim against Call One, seeking recission of the insurance contract. Berkley's cross-motion for summary judgment contends that recission is warranted due to material misrepresentations in Call One's 2018 Renewal Application.

### DISCUSSION

Summary judgment is proper where admissible evidence, considered as a whole, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). "A dispute is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment." *Blow v. Bijora, Inc.*, 855 F.3d 793, 197 (7th Cir. 2017). Courts take "the facts in the light most favorable to the non-movant, first for one side and then for the

other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

## I.     Breach and Recission of Insurance Contracts

In this case, Call One asserts that Berkley is liable for breach of the insurance contract. Under Illinois law, the elements of a breach of contract claim are: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Asset Exchange II, LLC v. First Choice Bank*, 953 N.E.2d 446, 455 (Ill. App. Ct. 2011). "The interpretation of an insurance policy is a question of law that may properly be decided on a motion for summary judgment." *DeSaga v. West Bend Mut. Ins. Co.*, 910 N.E.2d 159, 163 (Ill. App. Ct. 2009). "It is well settled that insurance policies are to be liberally construed in favor of the insured and in favor of coverage." *Worley v. Fender*, 79 N.E.3d 173, 177 (Ill. App. Ct. 2017). A court must give unambiguous terms their "plain, ordinary, and popular meaning," *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 508 F. Supp. 3d 249, 253 (N.D. Ill. 2020) (quoting *Central Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004)), but "any doubts and ambiguities are resolved against the insurer." *Citizens Ins. Co. of Am. v. Uncommon LLC*, 812 F. Supp. 2d 905, 909 (N.D. Ill. 2011) (applying Illinois law) (quoting *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 811 (7th Cir. 2010)).

With its counterclaim, Berkley seeks recission of the Policy. "Rescinding an insurance contract is a complete defense to an action on the policy." *Royal Maccabees Life Ins. Co. v. Malachinski*, 161 F. Supp. 2d 847, 853 (N.D. Ill. 2001). Once rescinded, "the rights of the parties under that contract are vitiated or invalidated." *Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 713 (Ill. App. Ct. 2004). Thus, if Berkley prevails on its counterclaim for

recission, then Call One's breach of contract action and its Illinois Insurance Code claim cannot succeed.

The Illinois recission statute governs recission of insurance contracts. It provides that:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefore. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company.

2 ILCS 5/154. This section "sets forth a two-prong test for determining if the policy may be rescinded. First, the statement must be false, and second, it either must have been made with actual intent to deceive or must materially affect the acceptance of the risk or hazard assumed by the insurer." *Ill. State Bar Ass'n Mut. Ins. Co. v. Law Offices of Tuzzolino & Terpinas*, 27 N.E.3d 67, 71 (Ill. 2015) (citation omitted). Because the second prong is disjunctive, "either an actual intent to deceive *or* a material misrepresentation which affects either the acceptance of the risk or the hazard to be assumed can defeat or avoid the policy." *Id.* (citation omitted).

With its counterclaim, Berkley pursues the latter theory: material misrepresentation. "A misrepresentation in an application for insurance is a statement of something as a fact which is untrue and affects the risk taken by the insurer." *Direct Auto Ins. Co. v. Beltran*, 998 N.E.2d 892, 901 (Ill. App. Ct. 2013) (citation omitted). "Incomplete answers or a failure to disclose material information on an application for insurance may constitute a misrepresentation when the omission prevents the insurer from adequately assessing the risk involved." *Methodist Med. Ctr. of Ill. v. Am. Med. Sec. Inc.*, 38 F.3d 316, 320 (7th Cir. 1994) (citing *Garde v. Country Life Ins. Co.*, 498 N.E.2d 302, 308 (Ill. 1986)). "[E]ven if innocently made," a misrepresentation "can serve as the basis to void a policy." *Ill. State Bar Ass'n Mut. Ins. Co*, 27 N.E.3d at 71.

10

Misrepresentations are material if "reasonably careful and intelligent persons would have regarded the facts stated [or omitted] as substantially increasing the chances of the events insured against, so as to cause a rejection of the application," *Meier v. Pacific Life Ins. Co.*, 63 F.4th 595, 600 (7th Cir. 2023) (internal quotation marks omitted), or "at the very least, reconsider its premiums." *Id.*

Lastly, a policy renewal is effectively a new contract. *Dungey v. Haines and Britton Ltd.*, 614 N.E.2d 1205, 1255 (Ill. 1993); *Burmac Metal Finishing Co. v. W. Bend Mut. Ins. Co*., 825 N.E.2d 1246 (Ill. App. Ct. 2005). As such, "[t]he [Illinois Insurance Code] does not make a misrepresentation in one application nullify all subsequent contracts between the parties." *Ill. State Bar Ass'n Mut. Ins. Co. v. Brooks, Adams & Tarulis*, 24 N.E.3d 237, 242 (Ill. App. Ct. 2014) (citing 215 ILCS 5/154); *see also Ill. State Bar Ass'n Mut. Ins. Co. v. Rex Carr Law Firm, LLC*, Nos. 4–16–0365, 4–16–0546, 2017 WL 2805126, at *5 (Ill. App. Ct. June 27, 2017) ("It follows that if policy No. 10 is to be rescinded because of a misrepresentation in an application, the misrepresentation has to be in the application for that particular policy, policy No. 10; misrepresentations in applications for other policies are irrelevant."). Here, the 2018 Renewal Application is operative. But that does not mean that information in earlier applications cannot be considered as evidence of whether the 2018 Renewal Application contained material misrepresentations.

## II.    Berkley's Counterclaim for Recission

Because recission of an insurance policy necessarily defeats actions brought under that policy, the Court begins with Berkley's cross-motion.

11

A.  **Improper Amendment and Waiver**

As an initial matter, Call One argues that Berkley's cross-motion for summary judgment must be denied due to two procedural defects: (1) improper amendment of the counterclaim and (2) waiver.

According to Call One, Berkley's cross-motion improperly seeks recission based on facts not pleaded in its counterclaim—namely, Call One's failure to mention either the City of Chicago audit, or out-of-state tax remittance issues, on the 2018 Renewal Application. Of course, Berkley cannot "alter[] radically the factual basis of [its] complaint at summary judgment." *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014). However, Berkley can "refine its recission theory at summary judgment based on evidence produced in discovery," *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729 (7th Cir. 2015), provided that its refined theory is fundamentally consistent with its complaint, *see Kostovestsky v. Ambit Energy Holdings, LLC*, 242 F. Supp. 3d 708, 718 (N.D. Ill. 2017) ("A plaintiff opposing summary judgment may not inject 'new and drastic factual allegations,' but instead must adhere to the complaint's 'fundamental factual allegation[s].'" (quoting *Whitaker*, 772 F.3d at 808)).

As pleaded, Berkley's counterclaim boils down to its allegation that Call One omitted material information on the 2018 Renewal Application by failing to disclose potential liabilities. (Dkt. No. 36.) Far from a "radical" departure, the facts and arguments Berkley adduces at summary judgment are in lockstep with its counterclaim. For instance, Berkley alleges in its counterclaim that "Call One ***knew of several potential issues*** for which Call One could face liability including ***but not limited to*** financial reporting deficiencies, its failure to comply with mandatory regulatory payments, and its failing to collect and remit taxes." (*Id.* ¶ 56 (emphasis added).) Elsewhere, Berkley alleges that Call One concealed "***other*** potential liabilities" on the 2018 Renewal Application. (*Id.* ¶ 62 (emphasis added).) By arguing in its cross-motion that Call

12

One failed to disclose the audit and its tax remittance issues in other states, Berkley simply details the "other" "kn[own]" "potential liabilities" that, in its view, should have been disclosed in 2018. (*Id.* ¶ 56, 62.) Thus, while Berkley did not plead either factual basis, the Court finds that both are consistent with its counterclaim.

Next, Call One argues that Berkley impliedly waived its recission counterclaim by not raising recission at the motion to dismiss stage. In addition, Call One seems to suggest that Berkley's recission claim is predicated on the 2018 Renewal Application alone, rather than information obtained afterwards. This matters, Call One contends, because it shows that Berkley engaged in unreasonable delay by waiting until 2022 to file its counterclaim.

The Court is unpersuaded. "[I]mplied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1113, 1150 (7th Cir. 2009). Even where waiver is implied, "the act relied on to constitute the waiver must be clear, unequivocal and decisive." *Id.* To the extent Call One identifies a specific act constituting implied waiver, it is Berkley's motion to dismiss, which Berkley based on a competing interpretation of the Policy rather than recission. But, as Berkley observes, Call One's complaint does not contain the facts relevant to recission. It is mostly concerned with the underlying IFCA litigation and Berkley's denial of coverage. Accordingly, Berkley's motion to dismiss cannot be reasonably understood as a clear, unequivocal, and decisive waiver of its recission counterclaim.

Call One's argument that Berkley waived recission through a delay of four years in seeking such relief is similarly misguided. Understood properly, Berkley's claim is not founded solely on Call's One failure to answer a question on the 2018 Renewal Application. Rather,

13

Berkley seeks recission based on its position that Call One did not answer the question *despite* its knowledge of potential liabilities. Berkley did not know about the potential liabilities in 2018. But, when it discovered them years later, it filed a counterclaim without undue delay. Thus, the Court finds that Berkley did not waive its recission counterclaim.

### B.        Merits of Berkley's Counterclaim

The parties dispute whether the relevant Policy language permits Berkley's theory of recission. In essence, Berkley contends that Call One made a material misrepresentation in its 2018 Renewal Application by failing to provide an answer to Question 5, which asked: "Within the last 12 months, has there been any change in the status of any claims, loss or circumstance reported in any application previously submitted to the Insurer?" (PRDSMF ¶ II.5.) According to Berkley, Question 5 obligated Call One to disclose three circumstances: (1) its failure to collect and remit Illinois state tax; (2) the City of Chicago Audit; and (3) its failure to remit taxes in other states. This obligation, Berkley argues, stems from Question 5's solicitation of certain "change[s]" to "circumstance[s]" provided in "previously submitted" applications. (*Id.*) From this premise, Berkley points to Call One's 2011 Application. There, Call One answered "No" in response to Question 37, which asked if it was "aware of any fact, circumstance or situation involving any Insureds that might reasonably be expected to result in a Claim." (*Id.* ¶¶ II.1–II.2.) Observing that Question 5 implicitly cross-references the 2011 Application, Berkley argues that because each of the "circumstance[s]" Call One omitted in 2018 "might reasonably be expected to result in a Claim," they should have been disclosed.

Call One's only substantive response to Berkley's interpretation falls flat. As Call One understands it, Question 5 of the 2018 Renewal Application *only* sought information related to *Claims* reported in prior applications. In other words, Call One was not obligated to disclose the

14

audit, or its tax remittance issues, because it had not identified either as a Claim in any earlier application. But Call's One interpretation turns a blind eye to the text of Question 5. That question does not just concern Claims, but inquires as to "any change in the status of any claims, ***losses or circumstances*** . . . ." Courts "presume that each contractual provision was inserted deliberately and for a purpose consistent with the parties' intent" and, where possible, "interpret a contract in a manner that gives effect to all of the contract's provisions." *Savings Bank v. Autoworks of Wauconda, Inc.*, 924 N.E.2d 1197, 1205 (Ill. App. Ct. 2010). Here, the inclusion of "losses" and "circumstances" in addition to "claims" forecloses Call One's narrow interpretation of Question 5. And because the audit and the tax remittance issues plainly constitute "circumstances," the Court finds it proper to consider whether their absence from the 2018 Renewal Application amounts to a material misrepresentation. *Id.*

Before considering these circumstances, the Court notes that the subsequent analysis turns on Question 37 of the 2011 Application even though the 2018 Renewal Application is operative. This is due to the cross-reference in Question 5 of the 2018 Application, which recalls Question 37. Again, Question 37 asked if Call One was "aware of any fact, circumstance or situation involving any Insureds that might reasonably be expected to result in a ***Claim***." What constitutes a "Claim" for the purposes of corporate liability is defined in the Policy. Altogether, then, if any of the circumstances omitted by Call One in 2018 could reasonably be expected to result in a Claim, then that omission amounts to a misrepresentation and the Court must next consider its materiality. *See Methodist Med. Ctr. of Illinois*, 38 F.3d at 230.[5]

---

[5]  In *Methodist Medical Center of Illinois*, the Seventh Circuit explained that "a failure to disclose material information on an application for insurance may constitute a misrepresentation when the omission prevents the insurer from adequately assessing the risk involved." 38 F.3d at 230. Here, the omission of a potential claim would have necessarily prevented Berkley from adequately (*i.e.*, completely) assessing Call One's financial risk. For an insurer, potential claims and risk are generally intertwined. *See Uhlich Children's v. Nat. Union Fire Co. of Pittsburgh, PA*, 929 N.E.2d 531, 537 (Ill.

### 1.    Call One's Failure to Collect and Remit Illinois State Tax

Berkley argues that when Call One executed the Renewal Application in June 2018, it knew about—but did not disclose—its failure to collect and remit state taxes in Illinois. Contending that this business practice might reasonably result in a Claim, Berkley reasons that Call One's omission constitutes a material misrepresentation and thus recission is warranted.

In relevant part, a Claim is a "written demand for monetary or non-monetary relief… arising from a Wrongful Act." (PRDSMF ¶ 13.) It is, alternatively, a "proceeding" for such relief filed against Call One due to a "Wrongful Act." (*Id.*) The term "Wrongful Act" denotes an "actual or alleged breach of duty, neglect, error, and misstatement, misleading statement, omission or act" by Call One. (*Id.* ¶ 15.) According to Berkley, Call One knew about its failure to remit Illinois state taxes when it completed the Renewal Application in June 2018 and was also aware that this "Wrongful Act" might reasonably result in a demand for relief or an adversarial proceeding. In support of this position, Berkley asserts that two salesmen—Havis and Waxman—both knew that Call One's exemption practices were potentially improper due to their engagement with Tinley Park, a potential customer that questioned Call One's stance. As further evidence, Berkley observes that the Illinois Department of Revenue informed Havis that no entity is exempt from the taxes at issue.

The problem with Berkley's argument, however, is that the Policy permits recission only if Call One's "President, Chief Executive Officer, Chief Financial Officer or Managing Partner" knew that information on an application was "untrue, inaccurate or incomplete." CFO Bragg-O'Connor, who executed the 2018 Renewal Application, testified that she was unaware of

---

App. Ct. 2010) ("The purpose of a claims-made policy is to allow the insurance company to easily identify risks, allowing it to know in advance the extent of its claims exposure and compute its premiums with greater certainty.").

any failure to collect and remit Illinois state taxes at the time of signing. Similarly, President Wynn testified that he believed Call One was in total legal and regulatory compliance until the OAG Subpoena in March 2019. Berkley, for its part, asserts that both executives knew about the issue in 2018. As such, a genuine dispute as to a material fact prevents summary judgment on this ground.

### 2. The City of Chicago Audit

Along similar lines, Berkley argues that when Call One executed the Renewal Application in June 2018 it knew about, but failed to disclose, the City of Chicago audit. The undisputed evidence shows that, in connection with the audit, various Call One executives waived the statute of limitations, including in November 2017—less than twelve months before Call One submitted the 2018 Renewal Application. According to Berkley, that waiver, by itself, constitutes a Claim. As such, Berkley reasons that Call One was obligated to disclose the audit when it renewed the Policy in 2018. Here, the Court notes that CFO Bragg-O'Connor signed both the 2017 waiver and the 2018 Renewal Application. Thus, unlike Berkley's prior argument concerning Illinois state tax, there is no genuine dispute as to whether Call One knew about the audit when it renewed the Policy. The question, then, is whether the audit, along with the attendant waiver, constitutes a Claim or, at minimum, a circumstance that might reasonably be expected to result in a Claim.

The Court finds that Call One omitted a Claim. First, it is undisputed that "a written request by a claimant to the Named Insured to toll or waive the statute of limitations for any Wrongful Act" amounts to a Claim under the Policy. (*Id.* ¶ 13.) Second, it is not genuinely disputed that the City of Chicago audited Call One because of its belief that Call One had not remitted the correct amount of tax. Third, when Call One waived the statute of limitations in 2017, it did so with respect to its liability vis-à-vis each tax type under review. It follows,

17

therefore, that if the City's suspicion that Call One underpaid taxes constitutes a "Wrongful Act," under the Policy, Call One omitted a Claim. Importantly, the definition of "Wrongful Act" is broader than just "***actual***" wrongdoing. Instead, it encompasses an "actual ***or alleged*** breach of duty, neglect, error, and misstatement, misleading statement, omission or act." (*Id.* ¶ 15.) Even viewing the evidence in the light most favorable to Call One and construing the Policy in its favor, the City's position that Call One failed to remit the correct amount of tax was, at the very least, an "alleg[ation]" of "error"—if not more. For these reasons, the Court finds that when Call One signed a waiver related to the audit but did not provide relevant details on the 2018 Application Renewal, it failed to disclose a Claim or a circumstance that might reasonably result in a Claim.

Call One's arguments to the contrary are unpersuasive. In essence, Call One relies on the fact that it never admitted wrongdoing at any point during the audit. Referencing the settlement agreement, Call One notes that it contested the City's determination that it failed to remit tax, adding that the City did not reach its conclusion until December 2019—well after Call One submitted the Renewal Application. But this argument overlooks the Policy's definition of "Wrongful Act," which includes ***alleged*** errors, not just actual ones. And even though the City did not reach its determination until 2019, the audit, which began in 2016, was always predicated on its allegation that Call One underpaid taxes. Call One's attempt to reframe the purpose of the audit is also unconvincing. Relying on CEO Wynn's testimony alone, Call One claims that the audit did not concern an alleged failure to collect or remit taxes but instead focused on whether Call One collected the correct amount. Call One's logic is self-defeating: failing to collect the "correct" amount of tax is an error.

Having found that Call One misrepresented its 2018 Renewal Application by omitting

18

information concerning the audit, the Court now turns to the second step in its recission analysis—materiality. Under Illinois law, misrepresentations are material if "reasonably careful and intelligent persons would have regarded the facts stated [or omitted] as substantially increasing the chances of the events insured against, so as to cause a rejection of the application," *Meier*, 63 F.4th at 600 (internal quotation marks omitted), or "at the very least, reconsider [the insured's] premiums." *Id.*; *see also Essex Ins. Co. v. Galilee Med. Ctr. S.C.*, 815 F.3d 319, 324 (7th Cir. 2016) ("Under §154, a misrepresentation is material if it 'affects either the acceptance of the risk or the hazard assumed' by the insurer."). "Testimony from an insurer's underwriter may be used to establish the materiality of omitted information." *Essex Ins. Co.*, 815 F.3d at 323.

In support of materiality, Berkey offers the testimony of its underwriter, who stated that he "relied on" the 2018 Application to provide Call One's renewal terms. (PRDSMF ¶ II.7.) This testimony, without more, falls short of establishing materiality. Where courts have deemed an underwriter's testimony responsive to the question of materiality, the underwriters testified that they would have either rejected the insurance application or issued it for higher a premium had they been aware of the omission or misrepresentation. *See, e.g.*, *Essex Ins. Co.*, 815 F.3d at 324 ("[The insurer] submitted an affidavit from the managing director of [its] underwriter stating that if [the applicants] had answered 'yes' to the disputed questions, [the insurer] would not have issued the policy or would have issued it for a much higher premium."); *Minn. Laws. Mut. Ins. Co. v. Schulman*, No. 14-cv-50142, 2016 WL 4988006, at *12 (N.D. Ill. Sept. 19, 2016) ("Here, [the insurer] submits an affidavit from its underwriter, averring that [it] would have declined to renew the policies or, 'at a minimum, would have required substantially more premium for the greatly increased risk,' had [the applicant] responded truthfully on his applications."). Here, the testimony of Berkley's underwriter is not directly responsive to the question of materiality. The

underwriter merely testified that he relied on the 2018 Application generally, not on Call One's answer to Question 5 specifically, nor did he testify that Call One's misrepresentation would have altered his acceptance of the application or premium determination.

Likewise, the Policy's Materiality Provision is not dispositive. Under the terms of the Policy, Call One agreed that the statements it made in the 2018 Renewal Application were "material representations and that th[e] Policy [was] issued in reliance upon the truth and accuracy of such statements." (PRDSMF ¶ 118.) To the extent courts have considered similar provisions in other insurance policies, they did not rely exclusively on those provisions to reach their findings of materiality. Rather, the courts noted that those provisions were consistent with the underwriter's testimony and thus substantiated a finding of materiality. *See, e.g.*, *Essex Ins. Co.*, 815 F.3d at 324 (noting that the underwriter's testimony was "consistent . . . with the Policy itself, which noted that all statements made in the application were material to the acceptance of the risk assumed by [the insurer]"); *Minn. Laws.*, 2016 WL 4988006, at *12 (observing that the underwriter's testimony was "consistent with the policies themselves," which included similar provisions). Where, as here, the testimony from Berkley's underwriter does not demonstrate materiality, the Materiality Provision standing along is not sufficient to do so.

Nonetheless, "while the materiality of a misrepresentation is ordinarily a question of fact, summary judgment is appropriate where the misrepresentation is of such a nature that no one would dispute its materiality." *Minn. Laws.*, 2016 WL 4988006, at *12 (citations omitted). This Court finds that Call One's misrepresentation is material as a matter of law because the omission satisfies Illinois's objective test.

If a reasonably careful and intelligent person learned that, in 2018, Call One was embroiled in an ***ongoing*** audit concerning an alleged failure to remit ***four*** types of taxes, that

person would, "at the very least, reconsider [Call One's] premiums." *Meier*, 63 F.4th at 600. The fact that Call One twice waived the statute of limitations with respect to *every* tax type under review and that Call One ultimately paid a substantial settlement in the amount of $360,000 to the City of Chicago further supports this conclusion. Call One's omission involving the audit "significantly increased [Call One's] exposure, and thus, [Berkley's] risk." *Essex*, 815 F.3d at 324. That the audit itself did not lead to Call One's exposure as to the OAG Subpoena and IFCA Lawsuit, which form the basis of this lawsuit, does not affect the materiality analysis. *Green v. Mass. Cas. Ins. Co.*, 269 B.R. 782, 789 (N.D. Ill. 2001) (explaining that, to be material, a misrepresentation need not "be one with regard to a matter upon which a claim is later predicated").

Call One does not offer much in the way of rebuttal. Its sole response appears to be that if Berkley's underwriter required further information from Call One then he would have asked for it. But this does not undercut the materiality of the omission. To the extent Call One suggests that the underwriter ought to have raised an eyebrow when he saw the blank response to Question 5 of the Renewal Application, "Illinois law imposes no duty on an insurer to conduct an independent investigation of insurability before issuing an insurance policy." *Brandt v. Time Ins. Co.*, 704 N.E.2d 843, 846 (Ill. App. Ct. 1998). Instead, "[a]n insurance company has the right to rely on the truthfulness of the answers given by an insurance applicant, and the insured has the corresponding duty to supply complete and accurate information to the insurer." *Id.* (internal quotation marks omitted).

In sum, after drawing reasonable inferences in Call One's favor, the undisputed facts nonetheless show that Call One materially misrepresented its 2018 Renewal Application by failing to disclose the City of Chicago audit. Because a single material misrepresentation is

sufficient to rescind the Policy, the Court declines to reach Berkley's final allegation that Call

One's failure to collect and remit taxes in other states. Thus, for the foregoing reasons, the Court

finds that Berkley is entitled to summary judgment as to its recission claim.

### III. Call One's Breach of Contract Claim

Because rescission is a complete defense to an action for breach of an insurance policy,

the Court need not reach the merits of Call One's breach of contract claim or its claim that

Berkley behaved unreasonably and vexatiously in violation of the Illinois Insurance Code, both

of which are predicated on the denial of coverage. "Where a contract is rescinded, the rights of

the parties under that contract are vitiated or invalidated." *Coregis Ins. Co.*, 821 N.E.2d at 713.

Without rights left to assert under the Policy, Call One's motion for summary judgment must be

denied. Nonetheless, for the sake of completeness, the Court touches briefly on the merits of Call

One's claims if Berkley were not entitled to recission.

To wit, according to Call One, the plain language of the Policy provides coverage for its

insurance claims related to the OAG Subpoena and the IFCA Action. Because Berkley failed to

defend and indemnify Call One with respect to those claims, Call One claims that Berkely

breached its duties under the Policy. In response, Berkley argues that it did not breach its duties

because (1) the IFCA Action was not a "Claim" under the Policy, (2) Call One's liability in this

matter is uninsurable as a matter of law, (3) the Professional Services Exclusion bars coverage,

and (4) the known-loss doctrine precludes coverage. The Court addresses each argument in turn.

### A. The IFCA Action as a "Claim"

According to Call One, the complaint for the IFCA Action was not only "a written

demand for monetary or non-monetary relief" but also gave rise to "a civil . . . proceeding for

monetary or non-monetary relief," thus rendering it a "Claim" under either definition in the

Policy. (DRPSMF ¶ 13.) While disputing that the IFCA Action was a written demand for relief,

Berkley acknowledges that it was a civil proceeding. But Berkley goes on to contend that the IFCA Action does not qualify as a "Claim" because it was not "commenced by . . . service of a complaint or similar pleading." (*Id.*) Given the *qui tam* nature of the IFCA Action, the complaint was filed under seal. (*Id.* ¶ 18.) As Berkley observes, the complaint in that action was not served until hours ***after*** Call One filed this action against Berkley on January 28, 2021. (PRDSMF ¶ 69.)

To determine whether the IFCA Action is a "Claim," the Court looks to the plain language of the Policy. The part of the Policy definition that defines a "Claim" as a civil proceeding is the most applicable. Interpreting the IFCA Action as a written demand for relief, in addition to or instead of a civil proceeding, would render each part mere surplusage. *Market Street Bancshares, Inc. v. Fed. Ins. Co*., 962 F.3d 947, 953 (7th Cir. 2010) ("[F]or each part of the policy definition [of 'Claim'] to have meaning, 'a civil proceeding commenced by the service of a complaint or similar pleading' must be excluded from 'a written demand for monetary or non-monetary relief.'"); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Standard Elec. Co.*, 87 F. Supp. 3d 810, 816 (N.D. Ill. 2015) ("[C]ourts should not 'interpret contracts in a manner that would render specific contractual language mere surplusage.'" (*quoting Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1121 (7th Cir. 1990)). The Court rejects such a reading.

Applying the Policy's definition of "Claim" as a civil proceeding, the Court finds that the IFCA Action qualifies. As relevant here, the Policy defines a "Claim" as "a civil . . . proceeding for monetary or non-monetary relief filed against an Insured arising from a Wrongful Act which is commenced by: (a) service of a complaint or similar pleading; (b) return of an indictment, information or similar document; or (c) receipt or filing of a notice of charges." (DRPSMF ¶ 13.) The Court reads this language as identifying different types of civil proceedings that may constitute a "Claim," including ones where a complaint is filed and subsequently served.

However, service of a complaint does not make a civil proceeding a "Claim" under the Policy. To the contrary, the Policy provides that "[a] Claim shall be deemed to have been first made at the time **notice** of the Claim is ***first received by any Insured***." (*Id.* ¶ 13 (emphasis added).) Thus, the Policy focuses on notice to the insured entity, and not service of a complaint to the insured entity, as the point at which a "Claim" is first made. *Cf. Market Street Bancshares*, 962 F.3d at 953 (considering an insurance policy's definition of the term "Claim," which clarified that "a Claim will be deemed to have first been made when such Claim is commenced as set forth in this definition (or, in the case of a written demand for monetary or non-monetary relief, when such demand is first received by [the Insured])"). Had Berkley intended service of a complaint to create a claim, it would have drafted the Policy accordingly. *See United Equitable Ins. Co. v. Thomas*, 193 N.E.3d 301, 317 ("Insurers, as the drafters of their policies, are empowered to select terms that are clear and unambiguous about the precise risks that are covered or excluded.").

Here, Call One received notice of the IFCA Action ***before*** it filed this action against Berkley. Indeed, in mid-March 2020, Call One reported to Berkley's insurance adjuster that the IFCA Action had prompted the OAG Subpoena. (DRPSMF ¶ 36.) And later, on March 26, 2020, the OAG provided Call One with a copy of the redacted complaint filed in the IFCA Action, which was then forwarded to Berkley's insurance adjuster hours later. (*Id.* ¶ 38.) Call One's counsel further communicated to Berkley that Call One potentially faced significant financial liability in the IFCA Action. (*Id.* ¶ 39.) Although Call One was not yet formally served with the complaint, these facts reveal that Call One was notified of the IFCA Action well in advance of bringing this lawsuit. Based on the Policy's plain language, and construing the Policy in favor of Call One as the insured entity, the IFCA Action is thus a "Claim" under the Policy.

Furthermore, the Court observes that the OAG Subpoena and the IFCA Action constitute a single Claim. Under the Policy, "[a]ll Claims based upon or arising out of the same Wrongful Act or any Related Wrongful Acts . . . shall be considered a single Claim." (*Id.* ¶ 17.) Despite its initial rejection, Berkley eventually accepted the OAG Subpoena as a Claim. (PRDSMF ¶¶ 18–20.) And the Court has now recognized the IFCA Action as a Claim. These Claims arose from the same alleged "Wrongful Act" or "Related Wrongful Acts"—namely, Call One's failure to collect and remit Illinois state taxes. Because the OAG Subpoena and the IFCA Action independently qualify as Claims and arose from the same Wrongful Acts, they constitute a single Claim under the Policy.

Under the Policy, then, the OAG Subpoena and the IFCA Action form a "Claim" for which Call One is entitled to coverage for both "Damages" and "Costs of Defense." With respect to the OAG Subpoena, the parties dispute whether Berkley paid all costs of defense. While Berkley maintains that it paid defense costs for the OAG Subpoena in a total amount of over $300,000, Call One disagrees, maintaining that Berkley failed to pay invoices that Call One submitted to Berkley for defense expenses it incurred in connection with the OAG Subpoena. (PRDSMF ¶ 24.) The OAG Subpoena aside, the parties do not dispute that Berkley refused to provide coverage for defense costs associated with the IFCA Action, given its position that the sealed *qui tam* complaint did not constitute a Claim. (*Id.* ¶ 52.) Although Call One agreed to pay $2,500,000 plus reasonable attorneys' fees to resolve the IFCA Action and the OAG investigation (*id.* ¶ 67), Berkley did not indemnify Call One for either component of the award. (DRPSMF ¶¶ 42, 44.) Seeing as the OAG Subpoena and the IFCA Action together constitute one Claim, and Berkley denied coverage for defense costs associated with the IFCA Action, absent

grounds for recission, Berkley would have breached its duty to defend and indemnify Call One with respect to the Claim.

### B.    Public Policy Arguments

Berkley further maintains that Call One's liability for failure to collect and remit Illinois taxes is uninsurable as a matter of law. Specifically, Berkley argues that coverage for Call One's liability violates public policy and that such liability does not constitute a "Loss" under the Policy. The Court disagrees.

The Court assumes familiarity with its Memorandum Opinion and Order dated February 25, 2022 (Dkt. No. 33), which denied Berkley's motion to dismiss and rejected its public policy arguments. Berkley repeats those same arguments in support of summary judgment, and the Court rejects them again on the same grounds. In further support of its arguments, however, Berkley points to *Astellas US Holding, Inc., v. Starr Indemnity & Liability Company*, 566 F. Supp. 3d 879 (N.D. Ill. 2021), which was pending on appeal at the time Berkley responded to Call One's motion. Berkely speculated that the Seventh Circuit's resolution of *Astellas* would support its public policy arguments. The Seventh Circuit subsequently resolved *Astellas*. And its decision supports this Court's prior ruling that the claims faced by Call One in the IFCA Action were claims for compensatory relief, not disgorgement of profits. *See Astellas US Holding, Inc. v. Fed. Ins. Co.*, 66 F.4th 1055, 1078–79 (7th Cir. 2023) ("The False Claims Act's remedial scheme does not depend at all on the defendant's (potential) profits or losses. In the absence of any evidence of profits or proceeds, we must assume that the settlement payment was measured not against disgorgement of (not-yet-alleged) fraudulent gains but against making the government completely whole. . . . In sum, we agree with the district court that the undisputed facts show that the settlement payment here was not restitutionary, so insurance coverage is available." (citations omitted)).

26

Next, Berkley argues that the amounts Call One owed to the State of Illinois are taxes, which are excluded from "Damages" and thereby do not constitute a "Loss" under the Policy. Berkley points to a case from an Illinois state appellate court in which a relator theorized that, "through her *qui tam* action, she [was] attempting to collect penalties and interest—not the tax itself—owed by defendants that defendants fraudulently withheld from the City." *City of Chicago ex rel. Walton v. Prog Leasing LLC*, 222 N.E.3d 274, 279 (Ill. App. Ct. 2023). In affirming dismissal of the action, the *Walton* court looked to the language of the City's false claims ordinance, which prohibits private actions that "concern[] the application, interpretation or enforcement of any tax ordinance." *Id.* at 279. Reasoning that "the term 'concerns' in [the ordinance] is broad," the court found that the ordinance plainly barred the *qui tam* action because it concerned the application, interpretation, or enforcement of a lease tax. *Id.* at 280–81. Contrary to Berkley's characterization of the case, the *Walton* court did not find that the owed amounts necessarily constituted taxes. Rather, in reaching its holding, the *Walton* court interpreted the language of the City's ordinance, not the IFCA. In short, *Walton* is inapposite here. With no other authority, the Court finds Berkley's position unpersuasive.

### C. The Professional Services Exclusion

Berkley also contends that the Professional Services Exclusion bars coverage for Call One's claims. According to Berkley, Call One's liability for failure to collect and remit taxes stems from tax advice that Call One supposedly gave to its customers and the corresponding tax returns that it prepared. As a result, Call One's liability is excluded from coverage because it involved the "performance of any professional services for others." (DRPSMF ¶ 120.) Where, "an insurer denies a duty to defend based on an exclusionary clause within a policy, its application must be clear and free from doubt." *Mesa Lab'ys, Inc. v. Fed. Ins. Co.*, 436 F.Supp.3d 1092, 1096 (N.D. Ill. 2020) (quoting *Hurst-Rosche Eng'rs, Inc. v. Com. Union Ins.*

27

*Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995)). "The burden of proving that a claim falls within an exclusion rests squarely on the insurer." *Id.* at 1096. Berkley has not met its burden.

While the Policy does not define the term "professional services," "[c]ourts that have construed professional liability exclusion clauses . . . have adopted an expansive definition of the term 'professional service,'" which "refers to any business activity conducted by the insured which involves specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to physical or manual in nature." *Hurst-Rosche Eng'rs*, 51 F.3d at 1343 (citations omitted). Notably, courts have recognized that the term can include the "preparation of tax returns" or "furnishing advice on tax matters." *See, e.g.*, *Wu v. S. Cross Res. Grp., Inc.*, No. 19 C 8388, 2021 WL 428830, at *3 (N.D. Ill. Feb. 8, 2021). That said, "Illinois law does not require one to be a CPA to prepare tax returns." *Mitchell v. Stonecasters, LLC*, 124 N.E.3d 1001, 1009 (Ill. App. Ct. 2018). And, as Berkley points out, "[o]ne does not have to be an accountant to incur liability for giving negligent tax advice." *Khan v. BDO Seidman, LLP*, 948 N.E.2d 132, 165 (Ill. App. Ct. 2011). So, Call One need not be an accountant to prepare tax returns or offer tax advice to its customers.

To the extent Call One relied on its preparation of tax returns to bar coverage, such conduct does not fall squarely under the Professional Services Exclusion. For one thing, Call One prepared tax returns for itself, not its customers. Seeing as Call One must have performed professional services "for others" for the exclusion to apply, Call One's preparation of tax returns does not trigger the exclusion.

Insofar as Call One communicated with its customers about tax benefits associated with the use of its products, such communications do not rise to the level of professional services under the Policy. As a provider of telecommunications services, Call One is not in the business

of offering tax advice. (DRPSMF ¶ 1.) Rather, Call One's communications with its customers dealt with their billing concerns and their potential savings from using its products. These communications do not constitute tax advice. Indeed, where non-accountants have incurred liability for offering erroneous tax advice, that advice often related to their profession and resulted in pecuniary losses to the plaintiff. *See, e.g.*, *Khan*, 948 N.E.2d at 595, 602 (finding that the defendants, an investment bank and its employees, "like an accountant, gave tax advice to [the plaintiff]," and observing that the defendants "were acting in the course of their employment when giving [the plaintiff] advice about the 'investments' and tax consequences," which "result[ed] in pecuniary losses in the form of contractual fees, attorney fees, back taxes, interest, and penalties" to the plaintiff). The same cannot be said of Call One, which communicated to its customers that they would not be responsible for the excise taxes if it was incorrect about the potential tax benefits. (PRDSMF ¶ 84.) Here, Call One, not its customers, incurred liability for its own failure to collect and remit taxes.

### D. The Known-Loss Doctrine

Berkley further asserts that the known-loss doctrine bars coverage. Under Illinois law, the known-loss doctrine "allows insurers to defeat claims relating to any undisclosed losses that were already realized at the policy's inception." *Bank of Am. v. Chi. Title Ins. Co.*, 455 F. Supp. 3d 665, 676 (N.D. Ill. 2020). The burden rests on the insurer to show that the known loss exists. *Id.*

In arguing that the known-loss doctrine applies, Berkley reiterates its arguments for rescission—that Call One knew or had reason to know of (i) its failure to collect and remit Illinois state taxes; (ii) the City of Chicago Audit; and (iii) its failure to remit taxes in other states. However, knowledge of these events alone is not sufficient to trigger the known-loss doctrine. *See, e.g.*, *Zurich Specialties London Ltd. v. Village of Bellwood, Ill.*, No. 07 CV 2171,

2011 WL 248444, at *12 (N.D. Ill. Jan. 26, 2011) ("The issue is not whether the insureds knew of the taping but rather whether they knew or had reason to know that a probable loss would occur due to the taping."); *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 607 N.E.2d 1204, 1212 (1992) ("The question is not whether [the insured] knew it was discharging a pollutant into the environment, as the insurers and their amici argue. Rather, the relevant question is whether [the insured] knew or had reason to know that a probable loss or liability would occur due to the PCB contamination alleged in the underlying complaints."). Berkely has not presented evidence showing that Call one knew, or had reason to know, that these events would result in liability. Consequently, the known-loss doctrine does not apply.

***

For the reasons stated, the Policy provided coverage for Call One's claims related to the OAG Subpoena and IFCA Action, and Berkley would have breached its duties to defend and indemnify Call One under the Policy had it not been entitled to recission as discussed above.

### IV.     Call One's Claim for Bad Faith Denial of Coverage

In addition to breach of contract, Call One asserts a claim that Berkely denied coverage for its insurance claims in bad faith. Pursuant to 215 ILCS 5/155, "an award of attorneys fees and costs is appropriate if insurers' actions are 'vexatious and unreasonable.'" *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (quoting 215 ILCS 5/155). "Section 155 does not create a cause of action but rather provides an extracontractual remedy for policyholders who have suffered unreasonable and vexatious conduct by insurers with respect to a claim under [a] policy." *Creation Suppl. Inc. v. Selective Ins. Co. of the Se.*, 995 F.3d 576, 579 (7th Cir. 2021).

"Because Section 155 is penal in nature, its provisions must be strictly construed." *Leonard S. v. Health Care Serv. Corp.*, No. 22 CV 6038, 2023 WL 7182988, at *2 (N.D. Ill.

Nov. 1, 2023) (quotation marks omitted) (citing *Citizens First*, 200 F.3d at 1110). "'Attorneys fees may not be awarded simply because an insurer takes an unsuccessful position in litigation[;]' rather, the evidence must show 'that the insurer's behavior was willful and without reasonable cause.'" *Id.* (quoting *Citizens First*, 200 F.3d at 1110). An insurer's conduct is not vexatious and unreasonable if: "(1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Id.* (quoting *Citizens First*, 200 F.3d at 1110). In determining whether an insurer's conduct violated Section 155, "courts must consider the totality of the circumstances." *W. Wind Exp. v. Occidental Fire & Cas. Co. of N.C.*, No. 10-cv-6263, 2013 WL 2285799, at *2 (N.D. Ill. May 23, 2013) (quoting *Golden Rule Ins. Co. v. Schwartz,* 786 N.E.2d 1010, 1018 (Ill. 2003)).

"Illinois law provides that a bona fide dispute over coverage is a complete defense to a Section 155 claim." *Meier*, 63 F.4th at 601. A bona fide dispute is one that is "real, actual, genuine, and not feigned." *Meier v. Pacific Life Ins. Co.*, No. 3:20-cv-50096, 2022 WL 952765, at *10 (N.D. Ill. Mar. 30, 2022). As this Court's ruling on Berkely's motion shows, Berkley has presented a valid defense to coverage. Given Berkley's well-founded rescission claim, the Court finds that there is a genuine dispute regarding coverage, thereby blocking Call One's Section 155 claim.

What is more, even if Berkley had not been entitled to recission, it did not act vexatiously and unreasonably. After initially rejecting the OAG Subpoena as a "Claim" under the Policy, Berkley then revised its position following Call One's expression of disagreement. (PRDSMF ¶ 18–20.) Ultimately, Berkely accepted the OAG Subpoena as a Claim and agreed to provide

Call One with a defense in connection with the OAG Subpoena, subject to a full and complete reservation of rights. (*Id.* ¶ 18–20.) Berkley then recommended four law firms to Call One, from which Call One selected one to serve as its counsel in connection with the OAG Subpoena. (*Id.* ¶ 22.) While the parties later disputed whether Call One was entitled to independent counsel under the Policy, Berkley agreed to fully fund the cost of a tax expert as a "Cost of Defense" to assist in determining Call One's potential exposure. (*Id.* ¶ 30.) Viewed together, these actions do not suggest vexatious or unreasonable conduct on Berkley's part with respect to the OAG Subpoena.

As for the IFCA Action, Berkley continued to deny coverage because it did not consider the IFCA Action to be a "Claim." (*Id.* ¶ 43.) This Court has rejected that reading of the Policy. Still, this Court determines that Berkley's actions did not evince bad faith. For example, to resolve the coverage dispute, Berkley agreed to participate in a mediation with Call One, although that attempt proved unsuccessful. (*Id.* ¶¶ 46, 50.) As the coverage dispute continued and Call One pursued a settlement with the OAG, Berkley made requests to meaningfully participate in the settlement process and for additional information to assess the extent of liability and damages. (*Id.* ¶¶ 53, 57, 60.) Despite denying coverage, Berkley offered $400,000 towards the OAG settlement in exchange for a full and final release of claims from Call One. (*Id.* ¶ 62.) These actions do not amount to vexatious and unreasonable conduct under Section 155.

## CONCLUSION

For the foregoing reasons, Berkley's motion for summary judgment (Dkt. No. 64) is granted, and Call One's motion for partial summary judgment (Dkt. No. 61) is accordingly denied.

ENTERED:

Dated:  September 30, 2025

Andrea R. Wood
United States District Judge